IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Precision Dose, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12 C 50180 |
| | ) | |
| vs. | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | Judge Philip G. Reinhard |
| Defendant. | ) | |

## ORDER

For the foregoing reasons, the government's motion [186] for summary judgment is denied. Plaintiff's motion [183] for summary judgment is granted. The government's motions to strike [219, 220, 221, 222] are denied. The government's objection [239] to the order [237] of the magistrate judge is denied. Judgment is entered in favor of plaintiff and against defendant in the amount of $72,522 for the 2007 refund and $74,146 for the 2008 refund plus statutory interest on both. This case is hereby terminated.

## STATEMENT-OPINION

Plaintiff, Precision Dose, Inc., brings this action against the United States seeking a refund of federal income taxes for the years 2007 and 2008. Jurisdiction is proper under 28 U.S.C. § 1346(a)(1). Both plaintiff [183] and the government [186] move for summary judgment. Additionally, the government moves to strike [219, 220, 221, 222] the testimony of four expert witnesses proffered by plaintiff. Also pending, is the government's objection [239] to an order [237] of Magistrate Judge Johnston denying the government's motion [235] to substitute a corrected version of Docket # 224, the government's "Objections to Precision Dose's L.R. 56.1 Fact Statement."

Plaintiff contends it is entitled to claim the Internal Revenue Code Section 199 "domestic production deduction" ("DPD") on its 2007 and 2008 tax returns. This deduction, if allowed, would result in refunds to plaintiff of $72,522 plus interest for 2007 and $74,146 plus interest for 2008.

Section 199 allows a taxpayer a deduction for a portion of its "qualified production activities income." 26 U.S.C. § 199(a)(1). "Qualified production activities income" is determined from a taxpayer's "domestic production gross receipts." 26 U.S.C. § 199(c)(1). "Domestic production gross receipts" means (as relevant here) any sale of "qualifying production property ("QPP") which was manufactured, produced, grown, or extracted ("MPGE") by the taxpayer in whole or in significant part within the United States." 26 U.S.C. § 199(c)(4)(A)(i)(I). QPP means (as relevant here) tangible personal property. 26 U.S.C. § 199(c)(5)(A). MPGE is not

1

defined in the Code. The Secretary of the Treasury is directed to prescribe regulations to carry out the provisions of Section 199.26 U.S.C. § 199(d)(10).

The regulations prescribed by the Secretary define "tangible personal property" as "any tangible property other than land, real property described in paragraph (m)(3) of this section, and any property described in paragraph (j)(3), (j)(4), (k)(1), or (l) of this section." 26 C.F.R. § 1.199-3(j)(2)(I). The regulations define MPGE as follows: "(1) Except as provided in paragraphs (e)(2) and (3) of this section, the term MPGE includes manufacturing, producing, growing, extracting, installing, developing, improving, and creating QPP; making QPP out of scrap, salvage, or junk material as well as from new or raw material by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles; cultivating soil, raising livestock, fishing, and mining minerals." 26 C.F.R. § 1.199-3(e)(1). "If a taxpayer packages, repackages, labels, or performs minor assembly of QPP and the taxpayer engages in no other MPGE activity with respect to the QPP, the taxpayer's packaging, repackaging, labeling, or minor assembly does not qualify as MPGE with respect to that QPP." 26 C.F.R. § 1.199-3(e)(2).

The government contends plaintiff only engages in repackaging which is expressly excepted from the definition of MPGE so that plaintiff's income from its activities is not "qualified production activities income" and, therefore, not entitled to the Section 199 deduction. Plaintiff maintains its activities do not fall within the repackaging exception and that it engages in MPGE with respect to QPP making the income received from its sales "qualified production activities income" entitling it to the Section 199 deduction.

Plaintiff sells "unit doses" of medications. A unit dose is a drug in a non-reusable container intended for administration as a single dose to a patient. The specific unit doses plaintiff sells are different liquid, oral drugs sealed in various size cups and syringes. Plaintiff buys, in bulk, certain drugs it deems marketable in unit doses and suitable for sale in unit doses.

Plaintiff's LR56.1 statement of facts thoroughly describes the process plaintiff undertakes in producing unit doses. The process runs the gamut from deciding what drugs to consider for possible unit doses; testing to determine their suitability and marketability; preparing specifications and documentation for the materials to be used and standard operating procedures for all processes and equipment to be used; developing cups and syringes (and the molds from which they will be made); working with the vendors that will make the containers; buying cups and syringes; contracting with laboratories to conduct stability studies to insure the drug remains within specifications when put into a unit dose and to establish expiration dates; running validation batches; setting up and conducting fill operations; conducting in process testing; conducting post-fill processing; performing release testing to determine if the unit doses are ready for release to customers; and batch record reviews to confirm no anomalies occurred during production.

Disregarding for the moment the (e)(2) exception for packaging, repackaging, labeling and minor assembly, plaintiff's activities related to the unit doses otherwise meet the definition of MPGE set forth in 26 C.F.R. § 1.199-3(e)(1). Plaintiff produces unit doses. The transitive verb "produce" is defined as "to cause to have existence or to happen." MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/produce (Last visited Sept. 2, 2015). There is no doubt plaintiff causes the unit doses to come into existence. While other entities make the drugs and supply the cups, and the syringes, a unit dose

2

does not exist until plaintiff completes its processes using the drugs, a cup or syringe, its machinery and employees. The drugs, the cups, and the syringes, exist independently of each other but none of them alone is a unit dose. Without plaintiff doing what it does with the drugs, cups and syringes, they are simply drugs, cups and syringes. Plaintiff's activities, its application of its processes to the drugs, cups, and syringes, produce a unit dose.[1]

As noted above, there is an exception in the (e)(1) definition of MPGE, for packaging, repackaging, labeling, and minor assembly. "If a taxpayer packages, repackages, labels, or performs minor assembly of QPP and the taxpayer engages in no other MPGE activity with respect to the QPP, the taxpayer's packaging, repackaging, labeling, or minor assembly does not qualify as MPGE with respect to that QPP." 26 C.F.R. § 1.199-3(e)(2). Based on this exception, even though plaintiff's activities otherwise meet the definition of MPGE set forth in (e)(1), those activities are not MPGE if those activities are only packaging, repackaging, labeling or minor assembly with respect to the unit doses- which are the QPP at issue. If all plaintiff does is repackaging, then plaintiff's activities are not MPGE and plaintiff is not entitled to the Section 199 deduction.

United States v. Dean, 945 F. Supp. 2d 1110 (C.D. Cal. 2013), concerned a taxpayer's S corporation, Houdini, Inc. Houdini designs gift baskets and outsources their production. Id., at 945 F. Supp.2d 1112, n.4. Designing the gift baskets involves, among other things, selecting the basket and the items to be placed inside and the "void fill" that holds everything together. Id., at 1112. "Houdini orders its baskets from suppliers in China. When it orders baskets, Houdini reviews samples and then provides the manufacturer with exact specifications for them. Houdini also purchases containers from suppliers in the United States. The void fill in a Houdini gift basket is a cardboard form or Styrofoam base that is placed inside the basket; the other items are in turn placed inside. Houdini generally designs the cardboard forms, indicating where the cuts and folds should be made; it then hires another company to make the cardboard forms. On occasion, Houdini purchases baskets with the void fill already included. Houdini purchases the items that are placed inside the baskets from other companies." Id.

The Dean court noted that the Houdini purchases "various items – chocolates, cookies, candy, cheeses, crackers, wine or alcohol, packaging materials, and a basket or boxes – for its final products. Next, the individual items are assembled in a gift basket or gift tower based on one of many detailed plans. This complex production process relies on both assembly line workers and machines. The final products, gift baskets and gift towers, are distinct in form and purpose from the individual items inside. The individual items would typically be purchased by consumers as ordinary groceries. But after Houdini's production process, they are transformed into a gift that is usually given during the holiday season." Id., at 1117-18. Dean observed that

---

[1] The parties argue word-by-word through the regulatory language whether plaintiff is engaged in manufacturing, producing, developing, creating, improving, changing, combining, assembling, or processing - all activities listed as MPGE in 26 C.F.R. § 1.199-3(e)(1). Since engaging in only one of these activities is sufficient to fall within the (e)(1) definition, the court will not at this point analyze plaintiff's activities word-by-word. The finding that plaintiff is producing QPP is enough to move the argument on to the determinative issue in this case – the application of the (e)(2) exception.

Houdini's production process "changes the form and function of individual items by creating distinct gifts" and that the Houdini's "complex production process" was "similar to purchasing various automobile parts from suppliers – such as the frame, engine, wheels, etc. – and assembling them to create the car itself, which is undoubtedly manufacturing." Id., at 1118. "Although some of Houdini's activities may constitute packaging or repackaging, this 'subassembly process' is only part of the complex production process that results in a distinct final product." Id., at n. 10.

      Here, plaintiff's activities in producing unit doses are analogous to those in Dean. "Package" is defined as "to present (as a product) in such a way as to heighten its appeal to the public" and "to enclose in a package or covering." http://www.merriam-webster.com/dictionary/package (Last visited Sept. 2, 2015). Dean, 945 F. Supp.2d at 1117. "Repackage" is defined as "to package again or anew: to put into a more efficient or attractive form.", http://www.merriam-webster.com/dictionary/repackage (Last visited Sept. 2, 2015); Dean, 945 F. Supp.2d at 1117. While it is certainly true, that packaging or repackaging is a part of what plaintiff does in producing the unit doses, plaintiff's activities include other production activities which render the (e)(2) exception inapplicable.

      The facts show plaintiff looks for drugs it believes it can successfully process into and sell as unit doses. Drug manufacturers do not seek bids from companies to repackage their drugs into small packages. Plaintiff engages in market research to determine which drugs to buy to turn into unit doses. Plaintiff works with potential customers to identify needs for new unit dose products. Plaintiff acquires sample drugs and tests them for suitability to be processed into unit doses. Plaintiff prepares specifications and works with vendors to develop cups and syringes that are suitable to use for unit doses for each drug that it buys. Sometimes existing cups or syringes are used and sometimes new ones are created through the joint efforts of plaintiff's personnel and vendor personnel. Plaintiff conducts mixing studies to determine the best mixing procedures to use to obtain the proper suspension of the active ingredient in each unit dose and whether the drug can be mixed in such a way that the proper suspension can be obtained at all. It tests plastics to determine compatibility with specific drugs for use in the cups or syringes. The cups, lidding, trays and product inserts are produced by vendors using plaintiff's proprietary design. For cups for which plaintiff owns the designs vendors use molds owned by plaintiff to produce the cups, for trays, which are designed by plaintiff, vendors use molds owned by plaintiff. For lidding which is designed by plaintiff, the vendors use cutting dies owned by plaintiff.

      This brief recitation of portions of plaintiff's activities in producing the unit doses show, that like in Dean, plaintiff engages in a "complex production process that results in a distinct final product." Dean, 945 F. Supp.2d at 1118 n.10.

      The government argues Dean is wrongly decided. It contends the Dean court failed to understand that all Houdini's activities were just part of the repackaging process and thus did not take those activities outside the (e)(2) exception. However, the court disagrees. Dean correctly determined that Houdini was creating an entirely new product – a gift basket or gift tower – which was not simply a method of repackaging the components included in the baskets or towers. A gift basket is not simply a container of stuff – like a grocery cart in which the items had been dropped when pulled from the shelf. It is a unique product itself. Likewise, a unit dose is a unique product. Plaintiff is entitled to the Section 199 deduction.

4

The government's motions to strike [219, 220, 221, 222] the testimony of four proffered expert witnesses are denied. The decision in this case depends on a legal interpretation of 26 C.F.R. § 1.199-3(e) (1) & (2). The court did not consider the opinions of these proffered experts in interpreting the regulation as the meaning of the language of the regulation is for the court to determine. No expert opinion is necessary or helpful to that interpretation.

The government's objection [239] to Magistrate Judge Johnston's order [237] is also denied. While it is true that some of the lines of the government's "Objections to Precision Dose's L.R. 56.1 Fact Statement" were covered by CM/ECF document identifier text, the court only considered facts supported by admissible evidence in deciding this case. The government's objections were articulated in its brief. Filing the corrected document would have no impact on the decision of this case.

For the foregoing reasons, the government's motion [186] for summary judgment is denied. Plaintiff's motion [183] for summary judgment is granted. The government's motions to strike [219, 220, 221, 222] are denied. The government's objection [239] to the order [237] of the magistrate judge is denied. Judgment is entered in favor of plaintiff and against defendant in the amount of $72,522 for the 2007 refund and $74,146 for the 2008 refund plus statutory interest on both. This case is hereby terminated.

Date: 9/24/2015  ENTER:

_Philip G. Reinhard_
United States District Court Judge

Electronic Notices. (LC)